**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARYLYNN DOMBROWSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 11 C 2102** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marylynn Dombrowski seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment asking for a remand. After careful review of the record, the Court now grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on January 14, 2008, alleging that she became disabled on May 31, 2000 from Meniere's disease,[1] silent migraines, loss of concentration and memory loss. (R. 186, 216, 221). The Social Security Administration ("SSA") denied the application initially on March 25, 2008, and again on reconsideration on June 16, 2008. (R. 103-07, 110-13). Plaintiff appeared with counsel at an administrative hearing on August 13, 2009,

---

[1] Meniere's disease" is "an inner ear disorder that affects balance and hearing." Symptoms include vertigo, dizziness, nausea, vomiting and sweating. (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001721/, last viewed on November 4, 2011).

and provided testimony along with a medical expert ("ME") and vocational expert ("VE"). The Administrative Law Judge ("ALJ") who presided over that hearing apparently retired before rendering a decision, so the case was reassigned to ALJ John L. Mondi. (R. 8). ALJ Mondi held a second hearing on January 13, 2010, and heard testimony from Plaintiff, ME Laura Rosch, M.D., and VE Aimee Mowery. (R. 68-100).

Less than a month later, on February 5, 2010, the ALJ found that Plaintiff was at all relevant times capable of performing her past work as a quality assurance software analyst, medical secretary and insurance clerk and, thus, is not disabled. (R. 8-15). The Appeals Council denied Plaintiff's request for review on January 28, 2011, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-3).

In support of her request for a remand, Plaintiff argues that the ALJ (1) improperly concluded that she did not meet Listing 2.07 for Meniere's disease; (2) erred in assigning weight to treating physician Dr. Kumar's opinion; (3) failed to consider her sensitivity to fluorescent lights in determining her RFC; and (4) made a flawed credibility assessment under SSR 96-7p. As discussed below, the Court agrees that the ALJ's credibility determination is not supported by substantial evidence and requires a remand.

## **FACTUAL BACKGROUND**

Plaintiff was born on July 7, 1959, and was 50 years old at the time of the ALJ's decision. (R. 186, 216). She has a high school education plus "some night school through college," and lives with her husband and two children. (R. 33, 72, 227). Between 1982 and May 2000, Plaintiff worked as a senior quality insurance software supervisor, quality insurance employee and software analyst at three different firms. (R. 222). Though

2

Plaintiff alleges a disability onset date of May 31, 2000, she worked as a receptionist and insurance clerk from August to December 31, 2005, and as a part-time receptionist from December 18, 2006 to May 30, 2007. (R. 72, 222, 230). Her date last insured ("DLI") for disability benefits was June 30, 2006. (R. 195).

## A.    Medical History

Plaintiff first started complaining of vertigo symptoms in 1998. A treatment note from the Glen Ellyn/Wheaton Medical Clinic ("Glen Ellyn Clinic") dated December 23, 1998 indicates that Plaintiff was suffering from sinus pain at that time and reported that she had been seeing Dr. Angelo R. Consiglio of the Loyola University Medical Center Department of Otolaryngology "for vertigo approximately three months now." (R. 910). Dr. Consiglio's records are difficult to decipher, but on November 11, 1998, he noted that Plaintiff was experiencing "less vertigo today." (R. 323).

### 1.    2000

Plaintiff next sought treatment for vertigo on January 27, 2000, when she went to the emergency room at the Glen Ellyn Clinic complaining of dizziness, fainting spells and headaches. She reported having an episode of vertigo five days earlier and told Dr. M. Nelson that when she stood up suddenly or had been standing for awhile, she "developed severe lightheadedness where she feels she's going to pass out." The symptoms were worse after she worked out. (R. 891). Plaintiff was taking Meclizine for nausea and Zyrtec for allergy symptoms at that time, and Dr. Nelson opined that the dizziness could be related to some earlier dysfunctional uterine bleeding. (*Id.*).

Plaintiff returned to the Glen Ellyn Clinic on February 3, 2000 for a follow-up examination. Dr. Nelson characterized her previous dizziness as "orthostatic

hypertension,"[2] and noted that she reported "feeling well now with no symptoms of lightheadedness." (R. 892). When Plaintiff saw Dr. Nelson again on February 9, 2000, she complained of having "a couple episodes of dizziness mainly after exertion," including aerobics, vacuuming and cleaning the house. She denied experiencing any vertigo, and Dr. Nelson referred her to an "ENT [ear, nose and throat doctor] for reevaluation and treatment." (R. 944).

Two days later, on February 11, 2000, Plaintiff returned to the Glen Ellyn Clinic because she felt like she was going to faint 17 times a day. The feeling became worse when she worked out, if she rapidly went from lying down to standing, or if she heard a high-pitched noise. (R. 965). This time Plaintiff was seen by Dr. Sandra Y. Lin, who diagnosed her with "[d]izziness – by history . . . unlikely vestibular [related to the inner-ear]," and otalgia (ear pain). (R. 966). Dr. Lin ordered an electronystagmography ("ENG") test to check for involuntary eye movements associated with vestibular dysfunction. Plaintiff took the test on February 17, 2000, and clinical audiologist Linda Berry, USCCC/A, found that it showed "unilateral weakness to the right." (R. 956). An MRI taken shortly thereafter on March 1, 2000, however, was "unremarkable." (R. 952). Plaintiff saw Dr. Lin again on March 13, 2000, still complaining of dizziness and "near fainting." She reported bilateral otalgia associated with exercise, as well as ear fullness that had improved with antibiotics. (R. 949-50).

_____

[2]     "Orthostatic hypertension" is "a rise in blood pressure upon assuming an upright position." It is "an underappreciated and understudied clinical phenomenon" with "no widely agreed-upon definition." (http://www.ncbi.nlm.nih.gov/pubmed/16932477, last visited on November 4, 2011).

4

On March 27, 2000, Plaintiff started seeing Dr. Sam J. Marzo of Loyola University's Department of Otolaryngology at the request of Dr. Consiglio. (R. 380). Plaintiff told Dr. Marzo that on January 31, 2000, she had experienced "acute onset of lightheadedness with right-sided ear fullness, tinnitus[3] and hyperacusis."[4] There was "a positional component" to the dizziness and "at times [she] feels as if she is fainting." (*Id.*). Plaintiff complained of nausea, but she "did not have any vomiting" and "really denied any true spinning" associated with vertigo. (*Id.*). Dr. Marzo found that Plaintiff had normal Quix and Romberg tests, but she "was unsteady on Sharpened Romberg testing."[5] (R. 381). Her February 17, 2000 ENG "revealed a 60% right-sided caloric weakness,"[6] and her Dizziness Handicap

---

[3]    "Tinnitus" is "the annoying sensation of hearing sound when no external sound is present." Symptoms include ringing, buzzing, roaring, clicking, whistling and hissing in the ears. (http://www.mayoclinic.com/health/tinnitus/DS00365/DSECTION=symptoms, last visited on November 7, 2011).

[4]    "Individuals with hyperacusis have difficulty tolerating sounds which do not seem loud to others," but "have little or no detectable hearing loss." (http://www.entnet.org/HealthInformation/hyperacusis-increasedsensitivity.cfm, last visited on November 4, 2011).

[5]    A "Quix test" is used to check for otolithic (inner ear) function. (http://www.ncbi.nlm.nih.gov/pubmed/6888128, last viewed on November 7, 2011). A "Romberg test" is "[a] clinical test used to evaluate dysequilibrium." (http://medical-dictionary.thefreedictionary.com/Romberg's+test, last viewed on November 7, 2011). The Romberg test is performed with the patient's eyes open, while a "Sharpened Romberg test" is performed with the patient's eyes closed. (http://en.wikipedia.org/wiki/Romberg's_test, last viewed on November 7, 2011).

[6]    A "Caloric" test "evaluate[s] function of the hearing nerve, which provides hearing and helps with balance." (*See* http://www.menieres-disease.ca/menieres_health_articles/diagnostic-tests-menieres-symptoms.htm, last viewed on November 18, 2011).

Inventory ("DHI")[7] was 90 with a reported four attacks in the previous six months. (R. 382). Dr. Marzo diagnosed right-sided ear fullness, right tinnitus, vertigo and "[p]robable right inner ear fluid imbalance." (R. 382). He opined that Plaintiff had "an early form of right-sided Meniere's disease," explaining that she "has all of the symptoms except for right-sided ear hearing loss." He instructed her to follow up with him in three months. (*Id.*).

When Plaintiff saw Dr. Marzo on June 19, 2000, she continued to complain of right-sided ear pressure and hyperacusis, and stated that she had experienced approximately seven episodes of vertigo since March 2000. (R. 384, 885). Dr. Marzo diagnosed right-sided ear fullness, right tinnitus, vertigo, possible right inner ear fluid imbalance, and allergic rhinitis. (*Id.*). He noted that Plaintiff "might have a co-existing allergic rhinitis as an exacerbation of her symptoms," and referred her back to Dr. Consiglio for sinus management. (R. 385, 886).

Dr. Consiglio examined Plaintiff on June 28, 2000. His notes indicate that she had Meniere's disease and "drop attacks,"[8] and he sent Dr. Marzo a letter stating that Plaintiff "will be undergoing allergy testing for further evaluation for a possible allergy etiology to her Meniere's disease." (R. 319, 884). Dr. Consiglio conducted the allergy test on August 11, 2000, and noted that Plaintiff was allergic to mold, wood and oak. The rest of his notes are

---

[7]     DHI is a test "to evaluate the self-perceived handicapping effects imposed by vestibular system disease." DHI scores increase with increases in the frequency of dizziness episodes. (http://www.ncbi.nlm.nih.gov/pubmed/2317323, last viewed on November 7, 2011).

[8]     "Drop attacks" are "sudden falls without loss of consciousness that are not precipitated by a specific stimulus, occur with abrupt onset and without warning, and are followed by a rapid return to baseline." (http://www.medlink.com/medlinkcontent.asp, last viewed on November 7, 2011).

illegible, so it is not clear how the findings relate to Plaintiff's Meniere's diagnosis, if at all. (R. 319).

More than four months later, on December 26, 2000, Plaintiff went to the Glen Ellyn Clinic complaining of arm pain after "working out."  (R. 876).

## 2. 2001 through 2003

Plaintiff had an audiogram on March 19, 2001 to test her hearing.  She complained of sensitivity to high frequency loud sounds, and exhibited "slight hearing loss" in both ears. Her speech discrimination, however, was excellent.  (R. 468).  Shortly thereafter, on June 5, 2001, Plaintiff saw Dr. J. Scruggs of the Glen Ellyn Clinic.  Her Meniere's disease was under "good control" at that time with medication, including the diuretic Midamor (also called Amiloride) for high blood pressure, Zyrtec, and Antivert for nausea.  (R. 864).  Dr. Scruggs noted that Dr. Marzo from Loyola had assessed Plaintiff with Meniere's disease/drop attacks and right-sided hearing loss, but he referred Plaintiff to Dr. Terry L. Donat to see if he agreed with that diagnosis.  (R. 851, 865).

When Dr. Donat examined Plaintiff on August 8, 2001, he determined that her Meniere's disease was "in good control on Amiloride," and recommended that she continue treatment with Dr. Marzo.  (R. 851-52).  The following month, on September 17, 2001, Plaintiff saw Dr. Marzo to follow-up on her right ear issues.  Dr. Marzo noted that she had tinnitus, pressure, and attacks of vertigo, and diagnosed her with "early right endolymphatic hydrops."[9]  (R. 392, 393).  An audiogram taken the same day showed "a mild high-

---

[9]     "Endolymphatic hydrops" is another name for Meniere's disease. (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001721/, last viewed on November 7, 2011).

frequency sensorineural hearing loss bilaterally," but excellent speech discrimination. (R. 392, 394, 488). Dr. Marzo instructed Plaintiff to return in six months. (R. 393).

Plaintiff next went to see Dr. Scruggs on October 18, 2001 complaining of chest congestion and ear pain. She told him that she was a runner, and he suggested that she "not exercise when sick." (R. 855). On April 8, 2002, Plaintiff had a follow-up examination with Dr. Marzo. She reported that her symptoms were "worse in the Spring and Fall," leading Dr. Marzo to believe that there was "an allergy component" to them. (R. 396). Plaintiff's medications included Amiloride, Zyrtec, Astelin inhaler for asthma, and Nasonex for allergies, and Dr. Marzo stated that he was "happy with this patient's progress and she will see me in follow up in six months." (*Id.*).

When Plaintiff saw Dr. Marzo on October 14, 2002, her symptoms were stable, but she reported having "occasional disequilibrium and some spinning vertigo lasting 30 seconds to 30 minutes, primarily around her menstrual cycle." (R. 407). Plaintiff said that during one of these episodes, she experienced hyperacusis, tinnitus and pressure. On examination, a binocular microscopic otoscopy was normal bilaterally, as was a Dix-Hallpike test for vertigo. (R. 407-08). Dr. Marzo diagnosed right peripheral vertigo with endolymphatic hydrops, and noted that Plaintiff was taking Amiloride, Zyrtec, Astelin, Nasonex, Meclizine and Valium at that time. (R. *Id.*). Dr. Marzo told Plaintiff to return in six months. (R. 408).

At that follow-up visit on April 10, 2003, Plaintiff's physical examination was normal, but she complained of "difficulty in shopping malls and supermarkets," and problems with motion. Dr. Marzo again diagnosed right peripheral vertigo with endolymphatic hydrops, and added a diagnosis of "probable migraine-associated dizziness." (R. 430). He

characterized Plaintiff as having "a complicated case" best addressed with medical management, and instructed her to continue taking Valium and Amiloride once a day. (R. 431).

On October 27, 2003, Plaintiff had another audiogram that again showed mild sensorineural hearing loss. (R. 487). During a visit with Dr. Marzo the same day, Plaintiff reported having flare-ups of vertigo and imbalance which she attributed to stress. The episodes lasted several minutes and were accompanied by right-sided ear pressure and bilateral tinnitus. (R. 436). Dr. Marzo noted that Plaintiff had normal results on binocular microscopic otoscopy and Dix-Hallpike testing, but 92% speech discrimination. (R. 436-37). He diagnosed disequilibrium, endolymphatic hydrops and vestibular migraine, and urged Plaintiff to adhere to a low-sodium diet. (R. 437).

### 3.    2004 through June 30, 2006

At her next appointment with Dr. Marzo on April 26, 2004, Plaintiff complained of a recent episode of "severe motion sensitivity associated with nausea and vomiting while flying." Her tests (binocular microscopic otoscopy and Dix-Hallpike) were once again normal, and Dr. Marzo refilled her prescriptions for Zyrtec, Nasonex, Meclizine, Valium and Amiloride. (R. 442-43). A progress note from Loyola dated August 11, 2004 reflects that Plaintiff "is a runner," and that she had developed a bunion. (R. 444-45).

Plaintiff returned to Dr. Marzo on October 25, 2004 for her next six-month check-up. (R. 446). She told the doctor that she had experienced problems with her balance and hearing over the previous two to three months, and that when someone screamed in her ear at a birthday party, her hearing in that ear was muffled for about 20 minutes before returning spontaneously. (*Id.*). Plaintiff's binocular microscopic otoscopy test was normal,

and an audiogram taken that day was "stable." (R. R. 446, 486). Dr. Marzo diagnosed "[s]table vestibular migraine" and again instructed Plaintiff to return in six months. (R. 447).

On April 25, 2005, Dr. Marzo reported that Plaintiff was "doing quite well." Her tests (binocular microscopic otoscopy and Dix-Hallpike) were normal, and Dr. Marzo diagnosed migraine-associated dizziness and positional vertigo. (R. 457). By the time Plaintiff saw Dr. Marzo again on October 24, 2005, she had started working two part-time jobs. (R. 222, 377). She said that she had been doing "okay" and was overall "able to work." (R. 377). She did complain of sensitivity to bright lights and motion, however. Testing was all normal (including binocular microscopic otoscopy and Dix-Hallpike), and Dr. Marzo diagnosed migraine-associated dizziness. (*Id.*). Shortly thereafter, on December 13, 2005, Plaintiff told Dr. Judge that she was exercising 4 to 5 days per week. (R. 538).

On April 24, 2006, Dr. Marzo noted that Plaintiff's hearing was relatively stable, though she reported experiencing occasional imbalance upon standing too quickly. (R. 536-37). Plaintiff also complained of fluctuating tinnitus and hearing loss on the right lasting hours to days. On examination, her ears were both normal, and she still exhibited only mild sensorineural hearing loss. Dr. Marzo diagnosed vestibular migraine and instructed Plaintiff to continue with her current treatment. (R. 537).

### 4. Evaluations Post-Dating the June 30, 2006 DLI

When Plaintiff saw Dr. Marzo on October 23, 2006, her headaches were "well controlled" and her past medical history was unchanged from the previous visit. (R. 530). Plaintiff's ears were normal on examination and Dr. Marzo diagnosed vestibular migraine and eustachian tube dysfunction. (R. 531). Plaintiff received a similar report from Dr. Marzo on April 23, 2007, though she did complain of "[s]ome sensitivity to bright lights."

10

(R. 527-28).  On October 22, 2007, Plaintiff told Dr. Marzo that she had lost her job "secondary to daily and chronic dizziness."  (R. 512-13).  Dr. Marzo noted that Plaintiff had "[s]ome exacerbation" of her symptoms "with hormones, bright lights, visual stimulation."  He indicated that Plaintiff "[c]an't work – will get me disability forms to complete."  (R. 513).

On March 24, 2008, Dr. Marion Panepinto completed a Physical Residual Functional Capacity Assessment of Plaintiff for the Bureau of Disability Determination Services ("DDS").  (R. 627-34).  Dr. Panepinto concluded that as of her DLI, Plaintiff had no exertional, manipulative, visual or communicative limitations, but she could only occasionally balance and stoop, and needed to avoid concentrated exposure to noise, vibration and hazards such as machinery and heights.  (R. 628-31).  According to Dr. Panepinto, these limitations were "secondary to vertigo, Meniere's and migraines."  (R. 631).  Dr. Terry Travis affirmed this assessment on June 11, 2008.  (R. 645-47).

Plaintiff started seeing Dr. Arvind Kumar, a neuro-otologist with the Ear Institute of Chicago, LLC, on May 7, 2009.  (R. 650, 837).  Dr. Kumar assessed her as having Meniere's disease and scheduled her for audio and vestibular evaluation.  (R. 651).  The following month, on June 22, 2009, a Torok VNG (videonystagmography) test showed "[r]ight sided decruitment which is a sign compatible with Meniere's syndrome on the right."  (R. 786).  The same day, Dr. Kumar wrote a note stating that Plaintiff "is suffering from intractable Meniere's disease which is disabling."  (R. 789).

On September 18, 2009, Dr. Kumar completed a Medical Assessment of Condition and Ability to do Work-Related Activities for Plaintiff.  He stated that Plaintiff told him she has suffered from right-sided Meniere's disease since 1989, and that she still has bouts of dizziness but "less severe and less frequent."  (R. 837).  Dr. Kumar indicated that Plaintiff

is "not able to perform any duties during an attack," and has marked limitations in her ability to complete a normal workday and workweek, and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 838-39). He also noted that she suffers from "disturbance of labyrinthine-vestibular function (including Meniere's disease)" demonstrated by caloric or other vestibular tests, and hearing loss established by audiometry. (R. 839). Dr. Kumar did not cite to any specific test results, but he opined that to a reasonable degree of medical certainty, Plaintiff's symptoms and limitations existed before her DLI of June 30, 2006. (R. 840).

### B.    Plaintiff's Testimony

In a February 11, 2000 Dizziness Questionnaire for Dr. Lin of the Glen Ellyn Clinic, Plaintiff reported that she "had vertigo before," episodes of double vision, and dizziness after exertion. (R. 970-71). When Plaintiff applied for disability benefits in January 2008, she provided the DDS investigator with additional information regarding her condition. (R. 220-44). She stated that she cannot work "under any place with fl[u]orescent lights because my optical nerve moves very fast," and she is unable to read a computer screen without throwing up. She also reported having to "vomit everyday and several times a day due to the nauseous feeling," and complained of a lack of balance or equilibrium. (R. 228). In connection with another disability report, the investigator noted that Plaintiff "went to the bathroom twice to vomit due to the lights," felt nauseous throughout the whole interview, and lost her balance when she got up. (R. 218).

On May 26, 2008, Plaintiff completed a Physical Impairment Questionnaire and a Function Report in connection with her application for disability benefits. (R. 256-57, 260-67). Plaintiff stated that she does not bend over often due to vertigo, and that her ability

to dial a phone, use a pen or pencil, carry bags of groceries or a basket of laundry, and turn pages of a book depends upon how bad her vertigo is at the time. (R. 256). She can sit for at least two hours if there are no fluorescent lights and not too much activity, but her "vertigo forces me to rest." (R. 257). Plaintiff reported that she can walk and drive short distances and shop for about a half-hour before getting nauseous and throwing up. (R. 263).

At the January 10, 2010 hearing before ALJ Mondi, Plaintiff testified that she worked for a few months in 2005, but the company went bankrupt. (R. 75). She tried to work part-time again in late 2006 and early 2007, but she only "made it six months." After that, she quit because she could no longer read without getting vertigo. (R. 72-73). Plaintiff said that she had regularly discussed the issue of disability benefits with Dr. Marzo, but that he "kept telling [her] to try to work." (R. 75). When she told him that she could no longer read, he finally agreed that "it's time." (*Id.*).

Plaintiff testified that she can only walk about two or three blocks, and she sits more than she stands or walks, though she tries to be active. (R. 76-77). She can cook small meals and fold laundry, but she sometimes has difficulty taking a shower and making a bed. She also has problems sleeping at night and needs a lot of help around the house. (R. 77, 79, 80-82). As a result of her condition, Plaintiff normally does not shop for groceries or drive distances of more than a mile. (R. 77, 79). She tried walking to the store once, but she had to stop a couple of times because she lost her balance and fell over. (R. 82). She also described having to pull over while driving and take a Valium to stop an episode. (R. 79).

When dealing with an attack of vertigo, Plaintiff feels a spinning sensation both while seated and standing. Valium helps "quite a bit," but sometimes she tries to "ride [it] out" without medication. (R. 83). Plaintiff's symptoms have worsened over the years such that she now has attacks six to eight times a day lasting between 15 and 20 minutes. (R. 80). Fluorescent lights "bring it on for me," as do certain high-pitched noises, which can lead to drop attacks. (R. 80-81). In that regard, Plaintiff is unable to attend her daughter's music concerts, and she "almost fell to the ground" during some of her hearing tests. (R. 85, 87).

Plaintiff told the ALJ that she had experienced five episodes of right-sided hearing loss since 2008. (R. 86). She characterized her Meniere's disease as a degenerative illness, and testified that she had started taking Valtrex under Dr. Kumar's care as an experimental form of treatment. (R. 76, 88).

## C.    Medical Expert Testimony

Dr. Laura Rosch testified at the hearing as an ME. She stated that Plaintiff suffers from Meniere's disease, which "has been present from well prior [to] the alleged onset date," but which does not meet or equal Listing 2.07 in the Social Security Regulations. (R. 89-90, 93). The ME observed that the medical record failed to indicate the frequency of Plaintiff's dizzy attacks, and found it significant that no doctor ever recommended that she stop driving or use a cane despite her condition. Nor did Plaintiff report to the emergency room with any sudden fractures resulting from drop attacks or falls. (R. 90-91). In the ME's view, it is "a big red flag when somebody says they're having drop attacks and they're still driving a car. It's very concerning." (R. 91).

In response to questioning from Plaintiff's counsel, the ME conceded that Listing 2.07 does not mention driving or require a certain frequency of attacks. (R. 93-94). She

also acknowledged that Plaintiff has disturbance of vestibular labyrinth functioning as set forth in the Listing, as well as some mild hearing loss. She opined, however, that Plaintiff's hearing tests did not establish "anything near" the Listing's requirements. (R. 92, 93). In addition, the ME explained that based on her interpretation of Listing 2.07 in comparison with the listing for seizure disorders, a lack of any driving restriction is evidence that Plaintiff does not have a history of frequent attacks and is "clearly . . . still able to function." (R. 93-94).

Based on her assessment of the medical record, the ME determined that Plaintiff has the ability to perform light work, except that she cannot be around hazards or temperature extremes, and must avoid rapid positional changes. She also cannot engage in frequent stooping, crouching, kneeling or crawling. (R. 92).

**D.    Vocational Expert Testimony**

Aimee Mowery testified at the hearing as a VE. She first addressed Plaintiff's past work, finding that the quality assurance software analyst position was skilled and light, the medical secretary position was skilled and sedentary, and the insurance clerk position was semi-skilled and sedentary. (R. 95). Next, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age and education, who has the residual functional capacity ("RFC") as set forth "by reviewing State Agency physicians" Dr. Panepinto and Dr. Travis. The VE testified that such a person could perform all three of Plaintiff's previous jobs. (R. 96). If, however, the person were limited to the full extent stated by Plaintiff at the hearing, then she would not be able to perform any jobs because she would be "off task" too frequently in order to lay down and change positions. (R. 96-97).

In response to questioning from Plaintiff's attorney, the VE clarified that the limitations she considered pursuant to the State Agency medical reviews included light work with avoidance of hazards, rapid postural changes, crouching, stooping, crawling, and extreme temperature changes. (R. 97-98). The VE also testified that if the individual needed to avoid exposure to fluorescent lights, then she would be unable to perform Plaintiff's past work, and "it would be very difficult" to find other jobs that did not have that type of lighting. (R. 98). An individual with limitations in the ability to complete a normal workday and workweek without interruptions, marked limitations in the ability to perform at a consistent pace, and significant deficiencies in sustaining concentration, persistence and pace, as set forth by Dr. Kumar, would similarly be incapable of performing any work. (R. 98-99).

**E.    The ALJ's Decision**

The ALJ found that Plaintiff appeared to have engaged in substantial gainful activity ("SGA") after the alleged disability onset date of May 31, 2000 because she earned $1,205 in December 2006, and $7,223 from January 1 to May 31, 2007. (R. 10). *See* 20 C.F.R. § 416.974(b) (earnings of more than $700 per month create a rebuttable presumption of SGA). Nevertheless, the ALJ went on to consider the remaining steps in the sequential analysis. He first determined that Plaintiff's Meniere's disease is a severe impairment, but he accepted the ME's conclusion that it does not meet or equal Listing 2.07 "due to the frequency of attacks." (R. 10-11). The ALJ next found that Plaintiff has the RFC to perform a full range of work at all exertional levels, except that she can only occasionally climb ladders, ropes and scaffolds, she cannot work at heights or around dangerous moving

machinery, and she must avoid concentrated exposure to noise, vibration and workplace hazards. (R. 11).

In reaching this conclusion, the ALJ stated that Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the assessed RFC, especially in light of Plaintiff's "use of medication and activities that include driving and walking without an assistive aid." (R. 12). The ALJ noted that there was "very little medical evidence of significant limitations" prior to the DLI, and that despite Plaintiff's diagnoses of Meniere's disease, tinnitus and vertigo, "there were very minimal findings on evaluation." (*Id.*). Even after the DLI, in October 2006, Plaintiff's condition "appeared to be controlled on medication." (*Id.*).

The ALJ discussed in detail Dr. Kumar's opinions, including that Plaintiff: has marked limitations in her ability to complete a normal workday and workweek; would likely experience significant deficiencies in sustained concentration, persistence and pace due to her symptoms; and has disturbed function of vestibular labyrinth and hearing loss. (R. 12-13). The ALJ declined to give these assessments controlling weight, however, because Dr. Kumar did not provide objective findings or detailed progress notes establishing marked limitations. (R. 13). Rather, the ALJ relied heavily on the ME's opinion that frequent episodes of dizziness or drop attacks "would result in . . . a recommendation" to refrain from driving, but no doctor imposed such a limitation on Plaintiff. (*Id.*). In addition, the postural and environmental limitations set forth by the ME were consistent with the evaluations provided by the state agency physicians. (*Id.*).

The ALJ found that up through her DLI, Plaintiff was capable of performing her past relevant work as a quality assurance software analyst, medical secretary and insurance

clerk. (R. 14). The ALJ acknowledged the VE's testimony that a person who could not be exposed to fluorescent lighting would have a difficult time finding employment, but he apparently rejected Plaintiff's claims in that regard. (*Id.*).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Id.*; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).  In this case, Plaintiff can only recover benefits if she establishes that she became disabled on or before June 30, 2006, her DLI.  42 U.S.C. § 423(a)(1)(A), (c)(1); *Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011).

**C.     Analysis**

Plaintiff argues that the ALJ's decision must be reversed because he (1) improperly concluded that she did not meet Listing 2.07 for Meniere's disease; (2) erred in assigning weight to treating physician Dr. Kumar's opinion; (3) failed to consider her sensitivity to fluorescent lights in determining her RFC; and (4) made a flawed credibility assessment under SSR 96-7p.  The Court considers each argument in turn.

### 1. Listing 2.07

Plaintiff first objects to the ALJ's conclusion that she did not meet Listing 2.07 "due to the frequency of attacks." (R. 11). To satisfy this Listing, Plaintiff must have:

> Disturbance of labyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B.
>
> A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>
> B. Hearing loss established by audiometry.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 2.07. It is undisputed that Plaintiff "must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits . . . under step three." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

In finding that Plaintiff was not disabled at step three, the ALJ relied on the ME's "testi[mony] that the claimant did not have impairments that meet or equal any medical listing, . . . in particular listing 2.07 for Meniere's disease." (R. 11). The ALJ focused specifically on the ME's assertion that as of June 30, 2006, the frequency of Plaintiff's attacks was not sufficient for purposes of the Listing. As the Commissioner notes, however, the ME further explained at the hearing that though the Listing does not define the phrase "frequent attacks," she considered the listing requirements for seizure disorders, as well as the fact that no doctor ever indicated that Plaintiff was unable to drive a car. (R. 90-91, 93-94). According to the ME, "[a]ny responsible physician would not let an individual operate a motor vehicle if they're in danger of having an attack." (R. 93).

Plaintiff argues that this explanation is inadequate because the ALJ did not recite all of the ME's testimony in his opinion. (Doc. 31, at 3). As Plaintiff sees it, the

Commissioner is attempting to "defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). The Court disagrees. An ALJ is not required to discuss every piece of evidence in the record as long as he builds an "accurate and logical bridge" from the evidence to his conclusion. *Simila*, 573 F.3d at 517. Here, the ALJ expressly cited to Listing 2.07 and the ME's opinion. *Cf. Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("[T]he ALJ did not discuss or even reference Listing 112.05 – the section critical to [the plaintiff's] case."); *Robinson v. Astrue*, 667 F. Supp. 2d 834, 843 (N.D. Ill. 2009) (the ALJ erred in failing to mention or discuss Listing 11.19). The ALJ also observed that the state agency physicians "concluded in March 2008 that [Plaintiff's] impairments did not meet or equal any impairment in Appendix 1." (R. 13). Viewed as a whole, the Court can easily trace the ALJ's reasoning as to step three.

Plaintiff insists that the reasoning is flawed because she has a "well-documented history of attacks" and the ALJ failed to explain why they were not sufficiently "frequent" to satisfy Listing 2.07. (Doc. 26, at 9, 10; Doc. 31, at 2). To be sure, on January 27, 2000, Plaintiff reported having an episode of vertigo "5 days ago," and in June 2000 she complained of having seven episodes of vertigo since March 2000. (R. 384, 891). In June and August 2001, however, Plaintiff's Meniere's disease was in "good control" with medication, and in April and October 2002, Dr. Marzo stated that he was happy with her progress and her symptoms were "stable." (R. 396, 407, 852, 864). On October 27, 2003, Plaintiff had flare-ups of vertigo, which she attributed to stress, and in April 2004 she reported a severe episode of motion sensitivity after flying in a plane. (R. 436, 442). Yet by April 2005, Plaintiff was "doing quite well," and in October 2006, her past history

remained unchanged and her headaches were "well controlled." (R. 457, 530). Plaintiff herself testified that Dr. Marzo repeatedly encouraged her to work prior to June 30, 2006 despite her reported symptoms. (R. 75). It is not clear how these records contradict the ME's testimony that Plaintiff's attacks of vertigo and dizziness were not frequent enough to satisfy Listing 2.07.[10]

Plaintiff also contends that the ALJ erred in failing to discuss specific medical tests that support Listing 2.07. (Doc. 26, at 8, 11). By way of example, Plaintiff claims that her September 17, 2001 and October 27, 2003 audiograms show that she had "progressive hearing loss" as required by the Listing. (*Id.* at 10). In fact, the tests both show only "slight" or "mild" bilateral sensorineural hearing loss. In assessing an October 25, 2004 test that produced similar results, an audiologist remarked that Plaintiff's hearing was "essentially stable." (R. 394, 446, 486-87). Dr. Marzo agreed that Plaintiff's hearing remained relatively stable as of April 2006 (R. 536-37), and the ME testified that Plaintiff's hearing loss did not establish "anything near" the Listing's requirements. (R. 92).

The Court recognizes that Dr. Kumar found Plaintiff's symptoms to be disabling prior to June 30, 2006. (R. 839-40; Doc. 26, at 10). As discussed in the next section, however, the ALJ fairly rejected this assessment. The Court also finds no merit to Plaintiff's contention that the ALJ was required to recontact her physicians regarding Listing 2.07.

---

[10] It is worth noting that Plaintiff continued to run for exercise despite claiming that she suffered from disabling vertigo and drop attacks. In October 2001, Plaintiff told Dr. Scruggs that she was a runner (R. 855), and a progress note dated August 11, 2004 confirmed that Plaintiff still "is a runner" and had developed a bunion. (R. 444-45). In December 2005, Plaintiff told Dr. Judge that she was exercising 4 to 5 days per week. (R. 538). At the hearing, the ME expressly commented on the fact that Plaintiff "exercises a lot." (R. 92).

(Doc. 26, at 11). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). There is no indication that the ALJ lacked sufficient evidence in this case to make a determination at step three of the analysis. *Compare Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005) (ALJ erred in rejecting two medical opinions, both of which indicated the plaintiff's seizures were frequent enough to meet Listing 11.02, without soliciting more evidence).

For all of these reasons, the Court is not persuaded that the ALJ committed reversible error by failing to more fully articulate his analysis at step three, and the case will not be remanded on this basis.

## 2. Dr. Kumar's Opinion

Plaintiff next argues that the ALJ erred in failing to give greater weight to Dr. Kumar's opinions. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5).

The ALJ acknowledged that Dr. Kumar's opinion would support Plaintiff's claim of disability, but he found it lacking in "significant objective findings or detailed progress notes

establishing marked limitations." (R. 13). In completing Plaintiff's Medical Assessment of Condition and Ability to do Work-Related Activities, Dr. Kumar failed to answer the question asking "[w]hat objective medical evidence exists relative to each condition, describing all observations, symptoms, history, tests and courses of treatment." (R. 837). He opined that Plaintiff has marked limitations in her ability to complete a normal workday and workweek, and significant deficiencies in sustained concentration, persistence and pace, but he did not cite to any medical records supporting these conclusions. (R. 839). Nor did he explain the basis for his assertion that these symptoms and limitations existed prior to June 30, 2006. (R. 840). As the ALJ observed, Dr. Kumar did not even start treating Plaintiff until May 2009, nearly three years after that DLI. (R. 13).

Plaintiff argues that Dr. Kumar did provide objective support for his opinion in the form of a Torok VNG dated June 22, 2009. (Doc. 26, at 13). That test showed "[r]ight sided decruitment which is a sign compatible with Meniere's syndrome on the right." (R. 786). The ALJ agreed, however, that Plaintiff suffers from Meniere's disease; the question is whether the condition is disabling. The 2009 Torok VNG test says nothing in that regard, particularly with respect to Plaintiff's limitations as of June 30, 2006. Dr. Kumar did not provide any notes reflecting his interpretation of the VNG, aside from his observation that Plaintiff exhibited "[n]o spontaneous nystagmus [involuntary eye movement]." (*Id.*). Nor are there any treatment notes setting forth the results of Dr. Kumar's physical examinations, or the basis for his conclusory assertion that Plaintiff's Meniere's disease "is disabling." (R. 843). It is well-established that a claimant is not disabled simply because her treating physician says so; that is for the Commissioner to decide. *Dixon v. Massanari*,

270 F.3d 1171, 1177 (7th Cir. 2001).  *See also Lopez v. Astrue*, ___ F. Supp. 2d ___, 2011 WL 3890852, at *15 (N.D. Ill. Sept. 6, 2011).

Plaintiff objects that the ALJ still should have weighed Dr. Kumar's opinion more heavily because he is a neuro-otologist specializing in disorders of the ear, whereas the ME specializes in pulmonary disease and internal medicine.  (Doc. 26, at 12, 13 n.2).  *See* 20 C.F.R. § 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.")  Plaintiff also notes that an ALJ cannot reject an examining physician's opinion based solely on a contradictory opinion from an ME.  (Doc. 26, at 13; Doc. 31, at 5 (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).  These arguments ignore the fact that both the ALJ and the ME considered and relied upon evidence submitted by Dr. Marzo, who served as Plaintiff's primary ear specialist from March 2000 through at least October 2007.

The ALJ cited to records that are clearly from Dr. Marzo, though he did not mention the physician by name, and stated that those "examinations and objective findings did not demonstrate significant limitations of a disabling impairment."  (R. 12).  Dr. Marzo's notes included the following observations: (1) in April 2002 he was "happy with this patient's progress" (R. 396); (2) in October 2002 Plaintiff's symptoms were "stable" (R. 407); (3) in April 2005 Plaintiff was "doing quite well" (R. 457); (4) in April 2006 Plaintiff's hearing was relatively stable (R. 536); (5) twice-yearly exams from 2002 through 2006 produced normal testing results (R. 377, 430, 436, 442, 446, 457, 531, 537); and (6) Plaintiff's audiograms from March and September 2001, October 2003 and October 2004 never showed more than mild sensorineural hearing loss.  (R. 468, 486-88).  The ME testified that prior to providing her opinion at the hearing, she reviewed all of the treatment records in evidence,

which would include these notes from Dr. Marzo.[11]  (R. 89).  Dr. Kumar, on the other hand, made no reference to Dr. Marzo's treatment records in concluding that Plaintiff was disabled prior to her DLI.

Plaintiff finally contends that the ALJ improperly failed to look at Dr. Kumar's treatment notes as a whole, and gave his opinions "short shrift."  (Doc. 31, at 6) (citing *Eakin v. Astrue*, 432 Fed. Appx. 607, 612 (7th Cir. 2011)).  The Court disagrees.  The ALJ discussed Dr. Kumar's assessments in detail (R. 12-13), but found that they were unsupported by objective medical evidence.  The ALJ also explained that he gave even less weight to Dr. Kumar's opinions regarding Plaintiff's condition prior to the DLI, before the doctor had ever seen her.  (R. 13).  The Court is satisfied that the ALJ considered the important medical evidence in this case and that his decision not to give controlling weight to Dr. Kumar's opinions is supported by substantial evidence.

### 3.    Fluorescent Lights

Plaintiff argues that the case must nonetheless be remanded because the ALJ failed to discuss her sensitivity to fluorescent lighting in determining her RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations."  *Rasmussen v. Astrue*, No. 10 C 2344, 2011 WL 1807019, at *11 (N.D. Ill. May 6, 2011) (quoting *Young*, 362 F.3d at 1000).  It is "a legal decision rather than a medical one," and an ALJ "must consider all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own

---

[11]    It also would include all of Dr. Kumar's records, even though the ME did not discuss some of them.  (Doc. 26, at 13).

statements about her limitations." *Sombright v. Astrue*, No. 10 C 2924, 2011 WL 1337103, at *14 (N.D. Ill. Apr. 6, 2011).

Plaintiff first mentioned sensitivity to bright lights when she saw Dr. Marzo on October 24, 2005. (R. 377). At the time, she was "doing okay" and "[o]verall able to work." (R. 377). There is no indication of light sensitivity in Dr. Marzo's treatment notes from April 24 or October 23, 2006, but on April 23, 2007, Plaintiff again reported "[s]ome sensitivity to bright lights." (R. 527, 530-31, 536-37). After that, it appears that Plaintiff's problem with fluorescent lights worsened significantly, as evidenced by the fact that she discussed the issue extensively in her disability application and at the hearing before the ALJ. (R. 80, 228, 257). However, no doctor ever indicated that Plaintiff should avoid exposure to fluorescent lights, either before or after her DLI.

The ALJ acknowledged the VE's testimony that a person who could not be exposed to fluorescent lighting would have a difficult time finding employment, but he did not incorporate such a restriction into Plaintiff's RFC. (R. 14). Plaintiff argues that this constituted reversible error, noting for example that "an SSA employee conducting an interview noted that she 'went to the bathroom twice to vomit due to the lights.'" (Doc. 26, at 15). That interview, however, occurred well after the DLI, in 2008. Plaintiff complained of sensitivity to bright lights only once prior to her DLI, and then did not mention it again for over a year. An ALJ "need[] only to include limitations in his RFC determination that [a]re supported by the medical evidence and that [he finds] to be credible." *Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011) (citing *Simila*, 573 F.3d at 520-21). On the record presented, the ALJ did not err in concluding that Plaintiff was capable of being around

fluorescent lights prior to her DLI, and the Court declines to remand the case based on this issue.

### 4.    Credibility Finding

Plaintiff finally argues that the ALJ's credibility determination is flawed and must be reversed.  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)).  *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong."  *Schmidt*, 496 F.3d at 843; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ's entire credibility assessment consists of the following statement:

[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated RFC] assessment when compared against the objective evidence and evaluated using the factors in Social Security Ruling 96-7p, especially her use of medication and activities that include driving and walking without an assistive aid.

(R. 12). In recent years, the Seventh Circuit has made it clear that this type of boilerplate language is largely meaningless. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) ("[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence); *Parker*, 597 F.3d at 921-22. The only substantive analysis provided by the ALJ is the phrase "especially her use of medication and activities that include driving and walking without an assistive device." Though the Court has strong doubts as to whether Plaintiff was disabled as of her DLI, the case must be remanded due to this inadequate credibility determination.

It is clear that the ALJ did not credit all of Plaintiff's testimony in this case, but he failed to identify which portions of that testimony were inconsistent with the RFC findings, or explain why they were not credible. *See Washington v. Astrue*, No. 09 C 4484, 2010 WL 3516114, at *13 (N.D. Ill. Sept. 1, 2010) (reversal required where the ALJ gave four reasons for finding the plaintiff not credible, but "failed to explain with the requisite specificity how these four reasons led him to reject [the plaintiff's] testimony.") The Commissioner finds it significant that the ALJ engaged in a brief recitation of some of Plaintiff's testimony as follows: "she can only walk 2 to 3 blocks. Bending can cause vertigo. She can sit okay unless having an episode . . . She has trouble sleeping." (R. 12). The ALJ, however, did not cite any of these factors as a basis for rejecting Plaintiff's credibility.

Recognizing this problem, the Commissioner attempts to supplement the record by pointing to other statements Plaintiff made which arguably cast doubt on her allegations of disability. (Doc. 30, at 11-12). For example, on a typical day Plaintiff got her daughter off to school, started laundry, talked to friends on the telephone, listened to books on tape, sat

29

outside, sometimes took a short walk or ran small errands, helped her daughter with homework, sometimes planted flowers, ironed, dusted and cleaned the kitchen, played cards, watched movies and visited with friends. (R. 260, 262, 264). Given that none of these statements appears anywhere in the ALJ's decision, they constitute improper post-hoc rationalizations that are insufficient to uphold the ALJ's credibility determination. *Parker*, 597 F.3d at 922 (the *Chenery* doctrine "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.")

The ALJ did mention Plaintiff's "use of medication" in connection with the credibility finding, and elsewhere in the opinion he observed that her "condition appeared to be controlled on medication" even in October 2006. (R. 12). Yet the ALJ only addressed the Valtrex and Diazepam Plaintiff reported taking at the time of the January 2010 hearing. (R. 12). He said nothing about the Meclizine and Valium she was routinely prescribed both before and after the DLI, nor did he explain how Plaintiff's use of these medications cast doubt on the stated severity of her symptoms.

With respect to Plaintiff's engagement in "activities that include driving and walking without an assistive aid," the ALJ appears to be referencing the ME's testimony that if Plaintiff had a disabling condition, then her doctors would have instructed her to stop driving and/or use a cane. The ALJ elsewhere in the opinion stated that Plaintiff did not meet Listing 2.07 "due to the frequency of attacks," and that "frequent attacks would result in . . . a recommendation" not to drive. (R. 11, 13). Unfortunately, the ALJ merely implied that Plaintiff's driving undermined her testimony regarding the frequency of her symptoms, without actually discussing her specific statements in that regard. For example, the ALJ did not address Plaintiff's assertions that she cannot drive more than a mile and has had

to pull over and take a Valium to stop an episode of vertigo. Nor did he mention Plaintiff's testimony regarding nausea and vomiting. "It is the ALJ's duty to state the basis of his findings . . . and the Court cannot substitute its own inferences and speculations for the ALJ's reasoning." *Cole v. Astrue*, No. 09 C 2895, 2011 WL 3468822, at *11 (N.D. Ill. Aug. 8, 2011). On this record, the ALJ's credibility determination is not supported by substantial evidence, and the case must be remanded for further consideration of this issue.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 25] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: November 22, 2011

SHEILA FINNEGAN
United States Magistrate Judge